UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CHARLES H. JULIAN,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:12-cv-2973** |
| | § | |
| **CITY OF HOUSTON,** | § | |
| | § | |
| *Defendant*. | § | |

<u>MEMORANDUM AND ORDER</u>

Pending before the Court in this employment discrimination suit is Defendant City of Houston's ("the City") Motion for Summary Judgment. (Doc. No. 35-1.) After reviewing the summary judgment record, the parties' arguments, and the applicable law, the Court is persuaded that Mr. Julian has raised genuine issues of material fact with regard to his race and age discrimination claims involving the failure of the City to allow him to "ride up" in the position of Acting Deputy Chief/Shift Commander in December 2010. The Court cannot conclude, however, that he has done so with respect to the remainder of his discrimination and retaliation claims. Therefore, the Court **GRANTS IN PART** and **DENIES IN PART** the City's motion.

## I.  BACKGROUND[1]

Plaintiff Charles Julian is a long-time veteran of the Houston Fire Department ("HFD" or "the Department"). An African-American man born in 1942, Mr. Julian joined the Department in 1968. By 1977, he had been promoted to Captain, and by 1980, he was serving as Senior Captain. In 1984, he was promoted to District Chief. (Doc. Nos. 36-2 at 2.) After unsuccessfully applying for further promotions, Mr. Julian sued HFD for employment discrimination in 1999,

---

[1] The following facts are undisputed unless otherwise noted.

and a jury found that HFD had denied Mr. Julian a promotion to Assistant Fire Chief because of his age. *See Julian v. City of Housto*n, No. H-99-0628 (S.D. Tex. filed Mar. 1, 1999). Following an appeal to the Fifth Circuit, HFD promoted Mr. Julian to the position of Assistant Fire Chief in late 2003. (Doc. Nos. 36-1 at 2; 36-2 at 2.) In September 2004, HFD demoted Mr. Julian to the position of District Chief. In 2006, after having pursued administrative remedies with the federal Equal Employment Opportunity Commission ("EEOC") and the Texas Commission on Human Rights ("TCHR"), Mr. Julian again sued HFD, alleging that the demotion was the result of both race and age discrimination, as well as retaliation for having previously sued HFD for employment discrimination. In October 2007, following a bench trial, U.S. Magistrate Judge Frances H. Stacy concluded that Mr. Julian's demotion was due to race and age discrimination and retaliation. Mr. Julian was awarded both backpay and front pay. *See Julian v. City of Houston*, No. H-06-0220 (S.D. Tex. filed Jan. 20, 2006). Throughout all of this litigation, Mr. Julian claims that he continued – unsuccessfully – to advance within the Department. Specifically, Mr. Julian alleges that he sought several times to work as Acting Deputy Chief/Shift Commander between 1992 and 2011, but was never allowed to work in that position. (Doc. No. 36-1 at 2-3.)

Soon after Annise Parker became Mayor of Houston in 2010, she initiated a search for a new Fire Chief for the Houston Fire Department. (Doc. No. 34-5 at 6:3-7:12.) The City hired an outside firm, Emergency Services Consulting, Inc. ("ESCI"), to conduct the search and to present the Mayor with two candidates.[2] (Doc. No. 36-6 at 27:15-28:16.) Mayor Parker told ESCI officials that she wanted a national search, with no preference for either an internal or

---

[2] Mayor Parker was responsible for appointing the Fire Chief, with confirmation by the City Council. (Doc. No. 36-20 at 5:21-25.)

external candidate, and that she wanted a "good thinker" who could "move the department forward." (Doc. No. 36-6 at 29:8-21.)

In January, 2010, Mr. Julian applied for Fire Chief, sending his application directly to Mayor Parker's office, as well as to the City Council, specifically, to then-City Councilmember Jolanda Jones. (Doc. Nos. 36-2, 36-3). In mid-February, Ms. Jones forwarded Mr. Julian's application to Mayor Parker. She recommended him for the Fire Chief position, stating that Mr. Julian is not "afraid to challenge the status quo in HFD. He has done so his entire career." (Doc. No. 36-4). Mr. Julian again submitted his application for Fire Chief, this time to ESCI, in accordance with the City's formal Fire Chief selection process, on June 18, 2010. (Doc. No. 36-7.) In all, twenty-four applicants were considered for the Fire Chief position. ESCI first narrowed the field to twelve semifinalists based on their applications, and written answers to submitted questions. (Doc. No. 36-6 at 106:1-5; 36-12 at 2-3.) Mr. Julian was not selected as a semifinalist; therefore, his application did not advance beyond the initial stage. (*See* Doc. Nos. 36-13, 36-14.) ESCI then conducted telephone interviews with the semifinalists and narrowed the twelve-person semifinalist pool further to a group of seven. (Doc. Nos. 36-6 at 106:10-107:1; 36-15.) From that seven-person group, ESCI selected two applicants to submit to Mayor Parker: Rick Flanagan, who is African-American, and Terry Garrison, who is Caucasian. (Doc. No. 36-6 at 154:13-20.) On August 25, 2010, the City announced that Terry Garrison was chosen as Houston's next Fire Chief. (Doc. No. 36-21.)

In November 2010, Mr. Garrison announced that he would be creating a new, eighth Deputy Chief/Shift Commander position. In a memorandum circulated that month, Carl E. Matejka, Acting Executive Assistant Fire Chief, announced that HFD would be accepting applications to fill the new Deputy Chief/Shift Commander position on a temporary basis, until a

permanent Deputy Chief/Shift Commander was hired. (Doc. Nos. 36-18; 36-17 at 57:5-58:11.) Mr. Julian applied for this position, but, in December 2010, it was awarded to Richard Mann, Greg Lewis, and Mark Donovan. (Doc. No. 36-23 at 23:16-21.) Mr. Mann and Mr. Donovan are Caucasian, while Mr. Lewis is African-American. (Doc. No. 36-23 at 25:3-4, 6-13, 26:2-3.) All are younger than Mr. Julian. (Doc. No. 36-23 at 25:18-26:1.)

Mr. Julian filed an EEOC and TCHR complaint on February 1, 2011 alleging that 1) he had received low performance evaluations since 2005; 2) he was denied the position of Fire Chief in June 2010; 3) he had been denied Acting Deputy Chief/Shift Commander positions from 1992-2011, and; 4) that he was denied the new Deputy Chief/Shift Commander position in 2010, all because of race and age discrimination and retaliation. (Doc. No. 36-1.) On June 4, 2012, Mr. Julian sued the City concerning these employment decisions in state court under the Texas Commission on Human Rights Act, Texas Labor Code §§ 21.001-21.556 ("TCHRA"). The City removed the case to this Court in October 2012, following Mr. Julian's addition of allegations under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"). The pending motion followed.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Importantly, "the mere existence of *some* factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be *genuine* and *material*." *Willis v. Roche Biomed. Lab.*, 61 F.3d 313, 315 (5th Cir. 1995). Material facts are those whose resolution "might affect the outcome of

the suit under the governing law . . . ." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248). A court may consider any evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, neither conclusory allegations nor hearsay, unsubstantiated assertions, or unsupported speculation will suffice to create or negate a genuine issue of fact. *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *Shafer v. Williams*, 794 F.2d 1030, 1033 (5th Circ. 1986); *see* Fed. R. Civ. P. 56(c)(4).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, but it need not negate the elements of the nonmoving party's case. Fed. R. Civ. P. 56(a); *Willis*, 61 F.3d at 315 (citing *Celotex*, 477 U.S. at 322-23); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). If the burden of proof at trial lies with the nonmoving party, the moving party may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. However, "[i]f the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

Once the moving party has met its burden, the nonmoving party must come forward with specific evidence and articulate how it supports its claim. *Baranowski v. Hart*, 486 F.3d 112, 119

(5th Cir. 2007). Simply resting on the allegations in the pleadings will not suffice. Neither will this burden be satisfied "by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court must draw all reasonable inferences in the light most favorable to the nonmoving party, and it cannot make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### III. LEGAL FRAMEWORK: EMPLOYMENT DISCRIMINATION

An employer violates Title VII if the employer fails or refuses to hire an individual or otherwise discriminates against the individual "because of" the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e−2(a)(1). In substantially similar language, the ADEA makes it unlawful for an employer to fail or to refuse to hire an individual "because of" that individual's age. 29 U.S.C. § 623(a)(1). Likewise, under the TCHRA, an employer "commits an unlawful employment practice" if the employer fails or refuses to hire or "discriminates in any other manner" against an individual "because of" the individual's race, color, disability, religion, sex, national origin, or age. Tex. Labor Code § 21.051.

To establish an ADEA claim, a plaintiff must prove that age was the "but-for cause" of the challenged employer decision. *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010). Neither Title VII, nor the TCHRA, is so strict, however. Under Title VII, "an employer's action will be found unlawful if the employee can demonstrate that her race was 'a motivating factor' for her firing, even if the employer was also motivated by other lawful factors." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (citing 42 U.S.C. § 2000e−2(m)). So too,

under the TCHRA, to establish an unlawful employment practice, plaintiffs need only prove that the discrimination was "a motivating factor" in the employer's decision. Tex. Labor Code § 21.125(a); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001).

The same evidentiary framework governs discrimination claims brought under Title VII, the ADEA, and the TCHRA. Violations of each of these laws can be proven using direct or indirect evidence. "'Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)); *see Jesperson v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653 (Tex. App.—Dallas 2012, no pet.). However, "[i]f an inference is required for the evidence to be probative as to [an employer's] discriminatory animus in terminating [the former employee], the evidence is circumstantial, not direct." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897-98 (5th Cir. 2002). *See Mission Consol. Independent School Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012). Here, Mr. Julian relies on indirect, circumstantial evidence.

Courts analyze employment discrimination cases built on circumstantial evidence of discrimination according to the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Vaughn*, 665 F.3d at 636; *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010); *Garcia*, 372 S.W.3d at 634. Under this familiar framework, when alleging either race or age discrimination, a plaintiff first must establish a prima facie case of discrimination. This requires a plaintiff alleging a failure to promote to demonstrate that: 1) the plaintiff was a member of a protected group;[3] 2) the plaintiff was qualified for the position in question; 3) the plaintiff suffered an adverse employment action; and

---

[3] For claims under the ADEA, the protected class is statutorily defined as "individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

4) the plaintiff was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). *See Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 643 (5th Cir. 2014) (stating the fourth prong as "the employer continued to seek applicants with the plaintiff's qualifications," for a failure to promote allegedly due to race discrimination); *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 395 (5th Cir. 2008) (stating the fourth prong as "the position was filled by someone younger or the failure to promote was due to his age," for a failure to promote allegedly due to age discrimination).

If the plaintiff is able to establish a prima facie case, the defendant must then come forward with a legitimate, non-discriminatory reason for the challenged employment action. *Moss*, 610 F.3d at 922. Importantly, at this stage, the defendant's burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). If the defendant successfully produces such evidence, the presumption of discrimination falls away, and the burden shifts back to the plaintiff. *Id.* at 143.

At this point, the evidentiary framework differs across the relevant statutes. Under Title VII and the TCHRA, the plaintiff, who always carries the ultimate burden, must "offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Assariathu v. Lone Star Health Mgmt. Associates, L.P.*, 516 F. App'x 315, 318-19 (5th Cir. 2013) (quoting *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (internal marks and citation omitted)).

8

However, because a plaintiff must prove age discrimination was the "but-for cause" of a challenged employment decision, no such "mixed-motive" analysis is permitted under the ADEA. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176-78 (2009) (precluding mixed-motive analysis in ADEA cases). The Fifth Circuit has held that, in failure to promote cases, plaintiffs have available to them two methods to demonstrate pretext: 1) showing that the defendant's proffered explanation is false or "unworthy of credence" or (2) proving that they are "clearly better qualified" than the person selected for the position. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 (5th Cir. 2007) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) and *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356-57 (5th Cir. 2001), respectively).

These employment discrimination statutes also prohibit an employer from taking an adverse employment action against an employee because she filed an employment discrimination charge or took other similarly protected action. 42 U.S.C. § 2000e-3(a); 29 U.S.C. 623(d); Tex. Lab. Code § 21.055; *Hague v. Univ. of Texas Health Sci. Ctr. at San Antonio*, No. 13-50102, 2014 WL 1257944, at *3 (5th Cir. Mar. 28, 2014) (unpublished) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)). These statutes do not "prohibit all retaliation, but rather those employment actions that are "materially adverse, one[s] that would dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vicknair v. Louisiana Dep't of Pub. Safety & Corr.*, 555 F. App'x 325, 330-31 (5th Cir. 2014) (quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009) (alterations, citation, and internal quotation marks omitted); *see Burlington Northern*, 548 U.S. at 68.

As with discrimination claims, if there is no direct evidence of retaliation – and Mr. Julian provides none – the analysis proceeds according to the *McDonnell Douglas* framework

outlined above. In this context, "[a] plaintiff establishes a prima facie case of retaliation by showing (i) he engaged in a protected activity, (ii) an adverse employment action occurred, and (iii) there was a causal link between the protected activity and the adverse employment action." *Assariathu*, 516 F. App'x at 322 (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012)); *see Brown v. CB & I, Inc.*, No. 09-12-00521-CV, 2014 WL 172413, at *6 (Tex. App.—Beaumont Jan. 16, 2014, no pet.).

Importantly, retaliation claims are subject to the "but for" causation standard. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —— U.S. ——, ——, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)."); *Ptomey v. Tex. Tech Univ.*, 277 S.W.3d 487, 497 & n.11 (Tex. App.—Amarillo 2009, pet. denied) (explaining that a plaintiff in a retaliation claim must satisfy the "but for" causation standard). Thus, in assessing pretext in the retaliation context, no "mixed-motive" analysis is permissible.

However, the Fifth Circuit has explained that "at the *prima facie stage*, 'the standard for satisfying the causation element is much less stringent than a but for causation standard.' . . . [but a] plaintiff must produce some evidence of a causal link between the protected activity and the adverse employment action to establish a prima facie case of retaliation." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (emphasis added) (quoting *Fierros v. Texas Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001)). Consequently, "a plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (internal citation and quotation marks omitted).

## IV. ANALYSIS

In his First Amended Petition (Doc. No. 1), Mr. Julian challenges four employment decisions: 1) the June 2010 denial of the Fire Chief position; 2) the December 2010 denial of a new, eighth Deputy Chief/Shift Commander position; and 3) denial of previous assignments to Acting Deputy Chief/Shift Commander positions; and 4) negative performance ratings. Each is addressed below.

### A.  The Fire Chief Position

Mr. Julian claims that he was denied the Fire Chief position in June 2010 because of both his age and his race, and in retaliation for protected actions which he had previously taken.

#### 1.  Age and Race Discrimination

It is undisputed that Mr. Julian has established a prima facie case of both race and age discrimination[4]: Mr. Julian was a member of relevant protected classes (he is African-American and was 67 years old at the time of the denial); 2) Mr. Julian was qualified for the Fire Chief position; 3) Mr. Julian was not promoted to Fire Chief; and, 4) the City continued to seek applicants with Mr. Julian's qualifications until it hired Mr. Garrison, who is Caucasian and was 53 years old at the time, as Fire Chief.

Attempting to meet its burden of production under the *McDonnell Douglas* framework, the City responds that Mr. Garrison was better qualified for the position. The City highlights

---

[4] While Mr. Julian alleges race discrimination in addition to age discrimination in the denial of the Fire Chief position, he only analyzes that adverse employment action in terms of age discrimination. This failure to brief the race discrimination claim is not dispositive of that claim, however. *See United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) ("If the moving party fails to meet [its] initial burden, the motion must be denied, *regardless of the nonmovant's response*.") (emphasis added) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). As analysis of both claims proceeds pursuant to the *McDonnell Douglas* framework, the following analysis of Mr. Julian's age discrimination claim applies equally well to his race discrimination claim.

three reasons why Mr. Garrison was better qualified than Mr. Julian: 1) Mr. Garrison ranked higher than Mr. Julian in ESCI's review, which provided candidates to the decisionmaker, Mayor Parker; 2) Mr. Julian lacked both a four-year college degree and a graduate degree, which were "highly preferred" and "desired" respectively; and 3) Mr. Garrison had prior Fire Chief experience, having served as Fire Chief in two other departments previously, as well as having served as a firefighter in Phoenix, Arizona for thirty years, where he attained the rank of Assistant Chief.[5]

### a)   ESCI's Review and Rankings

The City claims that its decision not to promote Mr. Julian to Fire Chief was not the result of discrimination, pointing to the fact that Mr. Julian was not selected as a semifinalist in ESCI's review and ranking process. According to the City, Mr. Julian was not one of the top twelve candidates, and therefore was not included in the semifinalist group.[6] Mr. Julian argues that the City has not met its burden of production under *McDonnell Douglas* because it has submitted evidence insufficient to explain ESCI's subjective rankings.

---

[5] Mr. Julian repeatedly argues that the City also offers Mayor Parker's statements that she wanted a "thinker" and a "change agent" as legitimate, nondiscriminatory, and nonretaliatory reasons for its action, but the Court does not understand the City to be making such an argument. Rather than placing the weight of its summary judgment motion on those statements, which Mr. Julian correctly observes were not disclosed in the Fire Chief position's qualifications, the City merely repeats them in its description of the facts. The City never explicitly makes such a claim, and the remarks appear nowhere in the City's legal argument. Consequently, the Court will not consider this contention from Mr. Julian.

[6] Mr. Julian disputes the City's ordering, citing rankings which place him at number eleven. (Doc. No. 36-13.) In response, the City points out that several candidates ranked higher than Mr. Julian were tied, making him perhaps the eleventh-highest ranked, but not the eleventh-highest candidate. *Id.* The Court is persuaded by the City's explanation: the summary judgment record clearly shows that Mr. Julian, though ranked eleventh according to his score, was in fact the fourteenth-ranked candidate, because some individuals tied. (Doc. Nos. 34-9; 36-13; 36-6 at 118:12-16, 119:2-23.) John ("Rick") R. Flanagan and David A. Foster, Donald R. Magnum, Sr. and Thomas E. Solberg, and William Little, and Michael Pruitt were tied for positions ahead of Mr. Julian's. *Id.*

Citing *Alvarado v. Texas Rangers*, 492 F.3d 605 (5th Cir. 2007), Mr. Julian argues that the City has not turned over ESCI's records from the initial ranking process, and, because it has failed to do so, this ranking process cannot be used to satisfy its burden of production. In *Alvarado*, the Fifth Circuit had before it a very similar question. There, Juanita Alvarado alleged that her employer, the Texas Department of Public Safety ("DPS"), did not appoint her to its Texas Rangers Division ("Rangers") because she is a woman. In its appointment process, DPS ranked applicants based first on a written exam and then on an interview. Those rankings placed Ms. Alvarado outside the top ten candidates, who were the only candidates offered positions with the Rangers. On appeal, Ms. Alvarado argued that DPS had failed to meet its burden of production under the *McDonnell Douglas* framework because DPS "offered no evidence that her interview score . . . was determined by sex-neutral factors or characteristics; thus, Alvarado argue[d], DPS's ostensibly nondiscriminatory reason for her non-selection is really the sort of nonspecific, content-less explanation that this court has found insufficient to satisfy an employer's burden of production." *Alvarado*, 492 F.3d at 616 (citing *Patrick v. Ridge*, 394 F.3d 311, 316 (5th Cir. 2004)). The court determined that the ranking process was a "determinative factor" in whether the applicant was included within the group of finalists, and found that the summary judgment record revealed that the question of which applicants were offered positions with the Rangers was "heavily influenced" by subjective evaluations of the applicants' performance in oral interviews. *Id.*

The *Alvarado* court affirmed the Fifth Circuit's previous holding that "[a]n employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection." *Id.* (citing *Patrick*, 394 F.3d at 317; *Chapman v. AI Transport*, 229

F.3d 1012, 1034 (11th Cir. 2000)). The court also hewed to its previous holding that "[s]uch a reason will satisfy the employer's burden of production, however, only if the employer articulates a clear and reasonably specific basis for its subjective assessment." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981); *Patrick*, 394 F.3d at 316-17; *Chapman*, 229 F.3d at 1034; *EEOC v. Target Corp.*, 460 F.3d 946, 957-58 (7th Cir. 2006)).

The court concluded that DPS had failed to show such a "clear and reasonably specific" basis for its subjective assessment because,

> [a]lthough the evidence shows that Alvarado received interview scores of 300, 325, 345, 345, 375, and 390, for a cumulative score of 347.5, DPS has offered neither an explanation nor evidence of how or why the interviewers arrived at those scores. Nor has DPS provided any evidence of why the Board rated the other candidates, particularly the ten men who were selected for the Rangers, higher than Alvarado. Alvarado's score sheets contain no notes or comments on her interview performance, and DPS has not pointed to any deposition testimony by the Board members that would shed light on why they scored Alvarado and the other candidates the way they did. Without some indication of the factual basis or specific reasons for Alvarado's interview score, the score says nothing about whether her non-selection for the Rangers was the product of intentional sex discrimination. Instead, the score "is at least as consistent with discriminatory intent as it is with nondiscriminatory intent" because Alvarado may well have received the relatively low interview score on account of her sex.

*Id.* at 617 (quoting *Patrick*, 394 F.3d at 317). This Court reaches the same conclusion here.

Here, each of the applications – including Mr. Julian's – initially was ranked according to twelve criteria, with each criterion eligible for up to ten points.[7] (Doc. Nos. 36-6 at 112:6-25; 36-12, at 1-2.) Those criteria were:

- **Education** (Four-year degree highly preferred. Graduate degree desired)
- **Time in Grade** (Ten years full-time command-level in an urban fire department highly preferred. Experience in an organization of comparable

---

[7] The City contends that Mayor Parker, the ultimate decisionmaker, had nothing to do with this aspect of the selection process. Far from relieving it of responsibility, that assertion actually supports a conclusion that Mayor Parker *could* have unknowingly served as a conduit for discriminatory animus or retaliatory motive on the part of ESCI team members. *See infra*, Section IV.A.2 (discussing the "cat's paw theory" of attributing adverse employment decisions).

size/complexity desired)

- **Training** (Completion of senior-level training, EFO or equivalent desired)
- **EMS** (Experience in management or an EMS delivery system desired)
- **Labor/Management** (Experience working with a labor union w/contract negotiation and contract management desired)
- **Community Involvement** (Level of involvement in professional public safety related organizations: local, state-wide, regional, and national. Level of support for organizational involvement also considered)
- **Fire Prevention Programs** (Awareness of basic functions of common fire prevention programs ((code enforcement, public education, investi[gations,] inspections)) desired)
- **Budget/Financial Management** (Ability to develop and administer a budget and take a proactive leadership role in funding, allocation expenditure, developing alternative strategies and recommending cost-saving approaches)
- **Written and Verbal Communications** (Ability to effectively communicate orally and in writing to a diverse audience. Grammar, spelling, etc. evaluation of submitted materials. Publications and articles applicant has completed. Experience as a public speaker)
- **Certifications** (Designation as a Chief Officer is desired)
- **Overall Experience** (Assessment of applicants over [sic] knowledge, skills, abilities, experience, education, and training that clearly demonstrated their ability to perform the essential functions of the position)

(Doc. No. 36-12 at 1-2.) Applicants were also asked to submit written answers to eight questions, but they were not included in the overall scores. (Doc. Nos. 36-6 at 72:9-73:1, 122:21-25; 36-12 at 2-3.) Each application was evaluated individually by four ESCI staff, who then met, "discussed our scores in the twelve criteria area[s] and arrived at a consensus score for each of the twelve." (Doc. No. 36-12 at 1.) That initial ranking *entirely* determined which of the applicants would be selected as semifinalists and advance to the next round of evaluation. (Doc. Nos. 36-6 at 120:3-12; 36-12 at 3.)

As reported by both parties, this ranking process produced the following results:

| Rank | Name | Score | | Rank | Name | Score |
|------|------|-------|---|------|------|-------|
| 1 | Terry Garrison | 105.5 | | 4 | Carl E. Matejka | 101.5 |
| 2 | Donald C. Brown | 103 | | 5 | John F. Mullin | 99.5 |
| 3 | John ("Rick") R. Flanagan | 102.5 | | 6 | John J. McNeil | 98.5 |
| | | | | 7 | Raul Reyes, Jr. | 96.5 |
| 3 | David A. Foster | 102.5 | | 8 | Donald R. Magnum, Sr. | 92.5 |
| | | | | 8 | Thomas E. Solberg | 92.5 |

15

| Rank | Name | Score |  | | |
|------|------|-------|--|--|--|
| 9 | William Little | 92 | 13 | Edgar A. Arthur, Jr. | 82 |
| 9 | Michael Pruitt | 92 | 14 | Blake C. White | 82 |
| 10 | Fernando F. Herrera | 87 | 15 | Rosa M. Arenas | 72 |
| 11 | Charles H. Julian | 84.5 | 16 | James M. Schmidt | 59 |
| 12 | Karen A. DuPont | 83 | 17 | John A. Grasso | 53 |
|  |  |  | 18 | Antwyne D. Johnson | 49 |

(Doc. Nos. 34-9, 36-13.)

It is true that this process is not a wholly subjective one; the reviewers evaluated each application according to twelve criteria. However, based on the summary judgment record before the Court, there are several points at which unexplained subjective assessments entered this process. First, the evaluators were called upon to make subjective assessments of each applicant according to each of the criteria. That is, the record does not include any scoring instructions beyond the rather vague descriptions above. Second, following their initial scoring, the evaluators met, discussed each applicant, and then reached a "consensus" score. Absent from the record are any objective criteria used to guide that process. Finally, one of the criteria – the final one, "Overall Experience" – amounts to little more than a catch-all category. It is designed, for example, to capture characteristics that are themselves explicitly and independently already included elsewhere in the criteria, such as experience, education, and training. While the other criteria may be more objective, the "Overall Experience" category seeks a subjective evaluation, and is therefore perhaps most susceptible to carrying an illicit motive.

Nevertheless, the City provides nothing other than this description of ESCI's process, including the list of the twelve criteria, and the final, *overall* scores of each of the applicants. Certainly, relatively detailed and specific notes as to how the evaluators reached their conclusions with regard to each of the criteria and each of the applicants would best serve to dispel any concern that impermissible discriminatory motives could have entered the evaluation process. The *Alvarado* decision is instructive. There, the Fifth Circuit faulted DPS for not

pointing "to any deposition testimony by the [interviewers] that would shed light on why they scored Alvarado and the other candidates the way they did." *Alvarado*, 492 F.3d at 617. At the very least, then, the City should be able to report the score each candidate received for each of the criteria.

The City, though, has done neither. Nor has the City offered any witnesses who can explain the scores. Jerry Freshour, who was a leader of the ESCI team that carried out the Fire Chief review and selection process, was not able to state which candidate received what score for any of the twelve criteria because ESCI had forwarded to the City all of its documents regarding the process. (Doc. No. 36-6 at 120:23-122:13.) The most that Mr. Freshour could say about Mr. Julian's application was that he was qualified for the Fire Chief position, but that other applicants "possessed better qualifications and fit the criteria better." (Doc. No. 36-6 at 133:8-25.) Though Mr. Julian has specifically requested the reviewers' notes, the City has not produced them, nor does it point to them in its summary judgment briefing.

Consequently, mindful that the City's burden is one of production only, and that no credibility determinations are to be made at this stage, the Court nevertheless must conclude that, under *Alvarado* and its progeny, the City cannot meet its burden of production by pointing to ESCI's rankings. The City has not come forward with "a clear and reasonably specific basis for its subjective assessment." *Alvarado*, 492 F.3d at 616. At root, just as the Fifth Circuit was in *Alvarado*, this Court is persuaded that Mr. Julian's "score says nothing about whether [his] non-selection for the [Fire Chief position] was the product of intentional [age] discrimination. Instead, the score 'is at least as consistent with discriminatory intent as it is with nondiscriminatory intent' because [Mr. Julian] may well have received the relatively low interview score on account of [his age]." *Id.* at 617. The Court does not necessarily find fault

with the evaluation and selection process; it seems that ESCI's staff generated documents explaining and giving reasons for their scores – but the City has not produced them. The Court merely determines that, without producing those documents, or staff who can testify to the same issues, the City cannot meet its burden of production.

This case is not like *Joseph v. City of Dallas*, 277 F. App'x 436, 441 (5th Cir. 2008), or *Browning v. Southwest Research Institute*, 288 F. App'x 170, 176-77 (5th Cir. 2008), where the defendants both pointed to specific reasons for their conclusions. This case does bear some similarity to *Assariathu v. Lone Star Health Mgmt. Associates, L.P.*, 516 F. App'x 315 (5th Cir. 2013). There, as here, the defendant did not produce the notes explaining the scores, but there, as here, the defendant did produce the guiding evaluative criteria and the characteristics those criteria were intended to assess. *Assariathu*, 516 F. App'x at 319. However, there, *unlike* here, in addition to this documentary evidence, the defendants "extensively explained the scores through deposition testimony." *Id.* By contrast, here, not only did Mr. Freshour not extensively explain the scores, he was unable to explain them at all. (Doc. No. 36-6 at 120:23-121:1, 122:8-13.) While the City has not submitted entirely unexplained scores, it has not produced enough evidence to put to flight any concerns that this absolutely critical initial review and evaluation process was not tainted by discriminatory motive. The City has not met its burden of production with this evidence.

### b)   The Candidates' Qualifications

However, the City also asserts that Mr. Garrison is more qualified for the position than Mr. Julian because Mr. Julian lacked both a four-year college degree and a graduate degree, which were "highly preferred" and "desired" respectively, while Mr. Garrison held both undergraduate and graduate degrees. (Doc. Nos. 34-6 at 14:8-15:17; 34-8; 34-11 at 5; 36-2 at 2,

36-5.) In addition, the City points to Mr. Garrison's prior Fire Chief experience – he had served as Fire Chief in two other fire departments, and had risen to the rank of Assistant Chief in the Phoenix, Arizona Fire Department, where had worked for over thirty years. (Doc. No. 34-11 at 2-3.) By contrast, the City claims that Mr. Julian has no such experience. Mr. Julian does not contest that the City has met its burden of production with this evidence. He responds instead that the City's response is merely pretextual: Mr. Julian claims that he was, in fact, better qualified for the Fire Chief position than Mr. Garrison, and that procedural irregularities in the selection process show that the City's reasons are false.

In order to demonstrate pretext with evidence that he was better qualified for the Fire Chief position than Mr. Garrison, Mr. Julian must show that he was "clearly better qualified (as opposed to merely better or as qualified)" than Mr. Garrison.[8] *Moss*, 610 F.3d at 922-23 (quoting

---

[8] In his First Supplemental Response to Defendant's Motion for Summary Judgment (Doc. No. 40), Mr. Julian claims that he need not show that he was "clearly better qualified" than Mr. Garrison in order to demonstrate pretext, and cites *City of Houston v. Julian*, 314 F.3d 721 (5th Cir. 2002), *Haire v. Board of Supervisors of Louisiana State University*, 719 F.3d 356 (5th Cir. 2013), *Pratt v. City of Houston*, 247 F.3d 601 (5th Cir. 2001), and *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408 (5th Cir. 2007), in support. These cases are unavailing, however.

The court in *Julian* merely reaffirmed the uncontroversial point that, "[a]lthough pointing to clearly superior qualifications is one permissible way to demonstrate intentional discrimination, a plaintiff is not *required* to make this showing." *Julian*, 314 F.3d at 728 (footnote omitted). Unlike here, where Mr. Julian seeks to demonstrate pretext by presenting circumstantial evidence that he was better qualified than Mr. Garrison, in that case, Mr. Julian presented direct evidence of discriminatory intent, making a demonstration that he was "clearly better qualified" than the applicant ultimately chosen unnecessary.

Mr. Julian contends that *Haire* stands for the proposition that courts do not consistently apply the "clearly better qualified" standard when comparing the plaintiff's qualifications to the applicant selected for the position, because the *Haire* court referred to the plaintiff's qualifications as "superior" to those of the applicant selected for the position. *Haire*, 719 F.3d at 365. Unlike here, however, Ms. Haire did not assert that her better qualifications demonstrated pretext. Rather, she argued "that she was punished, based on wholly arbitrary and subjective criteria; for an act she had an obligation to perform; and the subsequent formal reprimand cost her the promotion. " *Id.*

*EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995)); *see Price v. Fed. Exp. Corp.*, 283 F.3d 715, 723 (5th Cir. 2002) ("[A] showing that the unsuccessful employee was clearly better qualified is enough to prove that the employer's proffered reasons are pretextual."). To show that he was "clearly better qualified" than Mr. Garrison, Mr. Julian must present evidence from which a jury could conclude that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines v. Texas Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999). "[U]nless the qualifications are so widely disparate that no reasonable employer would have made the same decision," *id.*, any "differences in qualifications are generally not probative evidence of discrimination," *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir. 2001). The Fifth Circuit has been clear that "the bar is set high for this kind of evidence." *Id.*

Mr. Julian has provided the Court with a lengthy discussion of his credentials in relation to several of the qualifications announced by the City for the Fire Chief position. These qualifications sought a candidate with more than ten years of "progressively responsible, full-time experience in a command level position in an urban fire department." (Doc. Nos. 34-8; 36-

---

Similarly, in *Pratt*, the plaintiffs did not argue that their better qualifications demonstrated pretext. Rather, in response to the defendant's assertion that they did not complete the hiring process, they contended that the defendant did not give them the opportunity to complete that process. *Pratt*, 247 F.3d at 607. The court merely noted that they were qualified in its summary of their prima facie case of employment discrimination. *Id.*

Finally, the *Burrell* court made the legally unremarkable proposition that "[p]retext may be shown by any evidence which demonstrates the employer's proffered reason is false." 482 F.3d at 412 n.11. As cited above in this Court's discussion of the relevant legal framework, *Burrell* stated that plaintiffs alleging employment discrimination have available to them two methods to demonstrate pretext in a failure to promote case: 1) showing that the defendant's proffered explanation is false or "unworthy of credence" or (2) proving that they are "clearly better qualified" than the person selected for the position. *Id.* at 412. This is precisely the standard employed by this Court, and, as discussed below, Mr. Julian attempts to do both.

5.) There is no dispute that both Mr. Julian and Mr. Garrison easily met this requirement. Mr. Julian argues, however, that he has longer experience, having been a District Chief since 1984, which was about twenty-six years by 2010. (Doc. No. 36-2 at 3.) Mr. Garrison had served in a similar "command level position" – Battalion Chief – since 1996, which was almost fourteen years by 2010. (Doc. Nos. 34-11 at 4; 36-10 at 4.) Mr. Julian also argues that his actual firefighting command experience is longer. He states that he entered that level in 1977, when he was promoted to Captain, while Mr. Garrison only attained that level in 1998. (Doc. Nos. 36-2 at 3; 34-11 at 4; 36-10 at 4.) Thus, by 2010, Mr. Julian had thirty-three years of firefighting command experience while Mr. Garrison had only twelve. Mr. Julian also contends that the two years of Mr. Garrison's "middle-management career" were "essentially as a communications and public relations person." Pl.'s Resp. to Def.'s Mot. Summ. J. at 24 (citing Doc. No. 36-10) ("MSJ Response"; Doc. No. 36).

Mr. Julian goes on to compare the candidates' experience "in an organization of comparable size and complexity to the Houston Fire Department," which was one of the Fire Chief position's "desired" qualifications. (Doc. Nos. 34-8; 36-5.) Mr. Julian argues that Mr. Garrison had been Fire Chief in two "very small towns" – Carefree, Arizona,[9] and Oceanside, California.[10] (MSJ Resp. at 25; Doc. No. 36-9.) Further, Mr. Julian observes, Mr. Garrison attained the rank of Assistant Chief in the Phoenix, Arizona Fire Department.[11] (Doc. No. 36-11

---

[9] Mr. Julian claims that Carefree, Arizona (which he apparently believes is coterminous with the Daisy Mountain Fire District) employs eighty-eight firefighters. The City has put forward evidence from Mr. Garrison in which he states that the Daisy Mountain Fire District, for which he served as Chief, employed "nearly one hundred sworn firefighter/paramedics" at the time. (Doc. No. 34-11 at 2.)

[10] Both Mr. Julian and the City agree that the Oceanside, California fire department employs one hundred and thirty firefighters. (Doc. No. 34-11 at 2.)

at 3.) Mr. Julian argues that Mr. Garrison falsified his resume and/or application, alleging that he represented that he was Assistant Chief from 1977-2007, when, in reality, he was Assistant Chief in Phoenix from August 2006 to May 2007. (Doc. Nos. 34-11, 36-9, 36-10.) As included in the summary judgment record before this Court from both parties, however, Mr. Garrison's resume and application state that he worked for the Phoenix Fire Department from 1977-2007, and that he held two Assistant Chief positions between August 2006 and May 2007. (*Id.*) Mr. Julian states that he was Assistant Fire Chief from December 2003 to September 2004, and has extensive experience in a large fire department, with over four decades of experience in HFD which employs, according to Mr. Julian, 3,800 firefighters.

Indeed, Mr. Julian argues, Mr. Garrison supervised only two-hundred eighteen firefighters between *both* of his previous Fire Chief positions in Arizona and California. By contrast, Mr. Julian argues, he has been the District Chief for several years in what he claims is the seventh-largest fire district in the country. (*See* Doc. No. 36-2 at 3, 6.) Moreover, Mr. Julian's district encompasses a large geographical territory with several high-profile and difficult to manage institutions, including large hospitals and a university, in addition to a large population. Alongside this, Mr. Julian points to his management experience in four different HFD divisions: district chief, assistant quadrant chief, assistant fire chief (training academy), and assistant fire chief (planning and research), as well as his aircraft firefighting experience. (Doc. No. 36-2 at 7.) Mr. Julian claims that Mr. Garrison lacks such experience. Mr. Julian does not, however, link any of this experience to a particular qualification required for the Fire Chief position. Rather, he includes it while discussing the catch-all qualification assessing the

---

[11] Mr. Julian claims that the Phoenix Fire Department employs 1,400 firefighters. The City has put forward evidence from Mr. Garrison in which he states that the Phoenix Fire Department employs "over 1800 sworn personnel." (Doc. No. 34-11 at 3.)

"combination of education, experience, and training" which demonstrates capability for the Fire Chief position. (Doc. Nos. 34-8; 36-5.)

Mr. Julian also addresses the candidates' "awareness of the basic functions of common fire prevention, including code enforcement, public education, and inspection." (Doc. Nos. 34-8; 36-5.) This was a "desired" requirement. Mr. Julian points to his structural firefighting experience and his experience as Assistant Chief of Professional Development at the HFD fire academy, and claims that he was the "first to recommend [in 1989] the provision and installation of smoke detectors. . . . The basis of this program established the smoke detector program that is currently in effect today" within HFD. (Doc. No. 36-2 at 7.) Mr. Julian contends that Mr. Garrison's resume includes nothing comparable. The summary judgment record, however, reveals that one of Mr. Garrison's achievements as Fire Chief of Oceanside, California was the adoption of a Fire Code. (Doc. Nos. 34-11 at 2; 36-10 at 2.) In addition, as Assistant Chief/Deputy Fire Marshal of the Phoenix Fire Department's Urban Services Division, Mr. Garrison was responsible for the Fire Investigations, Special Hazards Inspections, Community Involvement, and Public Information Officer sections. (*Id.*)

Mr. Julian avers that neither candidate had any "experience in the management of an EMS delivery system," which was a listed requirement of the Fire Chief position. (Doc. Nos. 34-8; 36-5.) However, the summary judgment record demonstrates that, as Fire Chief in two departments, Mr. Garrison had responsibility for EMS delivery, and that one of his Fire Captain positions with the Phoenix, Arizona Fire Department was EMT Program Manager. (Doc. Nos. 34-11 at 4; 36-10 at 4.) Mr. Julian further states that he alone held any "experience in the management and delivery of training programs," a "desired" qualification, because of his experience serving as Assistant Fire Chief for HFD's training academy. (Doc. Nos. 34-8; 36-5.)

However, again, the summary judgment record is not so clear. Mr. Garrison's resume lists his participation in the administration of training simulations coordinated by the Texas Engineering and Extension Service/National Emergency Response & Rescue Training Center. (Doc. Nos. 34-11 at 4-5; 36-10 at 4-5.) Further Mr. Garrison's resume also reveals that, as Fire Chief of Oceanside, California, he developed and implemented training programs. (Doc. Nos. 34-11 at 2; 36-10 at 2.) The Fire Chief position also required "experience working with a labor union." (Doc. Nos. 34-8; 36-5.) Mr. Julian again contends that Mr. Garrison lacked any such experience. He points to his own involvement in organizing the Black Firefighters Caucus, which was included in the Houston Firefighters Union in 1982. (Doc. No. 36-2 at 6-7.)

Finally, Mr. Julian addresses the requirement of "a proven history of continuing involvement in the community." Mr. Julian points to years of involvement with such organizations and events as the Red Cross, the Dr. Martin Luther King Scholarship Ball, and fundraisers to supply smoke detectors to the elderly. (Doc. No. 36-2 at 3, 6.) He also points to a proclamation from Mayor Parker's office designating July 6, 2002 as "Charles Julian Day," in recognition for "his many contributions to our community." (Doc. No. 36-42.) Again, Mr. Julian contends that Mr. Garrison cannot point to anything comparable.

The City has not mounted nearly as detailed a defense of Mr. Garrison's qualifications. However, it does point to Mr. Garrison's education. Mr. Garrison not only had an undergraduate degree in Fire Science Management, he had a graduate degree in education as well. In addition, Mr. Garrison had completed a Certified Public Manager program as Arizona State University which led to his certification as a Certified Public Manager ("CPM"), as well as the "Driving Government Performance Program" from the Kennedy School at Harvard University. Mr. Garrison's resume also lists attendance at the Institute for Public Executives, Advanced Public

Executive Program at Arizona State University. (Doc. Nos. 34-6 at 14:8-15:17; 34-11 at 5; 36-10 at 5.) The City also points to Mr. Garrison's experience as Fire Chief in two other departments, experience which Mr. Julian lacks, and to Mr. Garrison's thirty-year career with the Phoenix, Arizona fire department. (*Id.*)

In assessing this evidence, the Court is mindful that "an 'attempt to equate years served with superior qualifications . . . [is] unpersuasive.'" *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996) (quoting *Bodenheimer v. PPG Indus.*, 5 F.3d 955, 959 (5th Cir. 1993)). "Obviously, work experience is one component of defining who is more qualified," but "greater experience alone will not suffice to raise a fact question as to whether one person is clearly more qualified than another. More evidence, such as comparative work performance, is needed." *Id.* (internal quotations and citations omitted). Indeed, the Fifth Circuit has instructed district courts that, when considering whether one candidate is "clearly better qualified" than another, "[t]he fact that one candidate has 'better education, work experience, and longer tenure with the company do[es] not establish that he is clearly better qualified.'" *Churchill v. Texas Dep't of Criminal Justice*, 539 F. App'x 315, 321 (5th Cir. 2013) (quoting *Price*, 283 F.3d at 723).

Here, both Mr. Julian and Mr. Garrison meet many of the City's requirements for the Fire Chief position. Mr. Julian concedes that both had well over ten years of "progressively responsible, full-time experience in a command level position in an urban fire department." (Doc. Nos. 34-8; 36-5.) Both had "[a]wareness of the basic functions of common fire prevention programs." (*Id.*) Both had served as assistant fire chiefs. (*Id.*) Both even had a similar failing: neither had relevant labor union experience. Mr. Julian points to his experience with the Black Firefighters Caucus within the Houston Firefighters Union. However, the qualification specifically sought "contract negotiation and contract management" experience. (*Id.*) Mr. Julian

does not contend that his work with the Black Firefighters Caucus involved either contract negotiation or contract management. Similarly, in his deposition, Mr. Garrison reported that, while he had labor union experience, he lacked experience in contract negotiation and management. (Doc. No. 36-17 at 27:18-23.)

But, there are significant differences as well. Mr. Garrison had over thirty years of experience as a firefighter in Phoenix, which is a major U.S. city. Still, Mr. Julian certainly had more "[e]xperience in an organization of comparable size and complexity to the Houston Fire Department" – at the time, he had been a supervisory-level member of that very Department for decades. (Doc. Nos. 34-8; 36-5.) Indeed, Mr. Julian's argument largely amounts to claiming more experience than Mr. Garrison. On the other hand, Mr. Garrison has both undergraduate and graduate degrees, while Mr. Julian has neither. And, Mr. Garrison has twice previously served as a Fire Chief in two different departments, while Mr. Julian has never served as Fire Chief in any fire department.

There can be no question that Mr. Julian is a highly qualified firefighter who has served the people of Houston with distinction for decades. (*See* Doc. Nos. 36-2; 36-3; 36-7; 36-8.) However, Mr. Garrison is also highly qualified. (*See* Doc. Nos. 34:11; 36-9; 36-10.) The Court is faced with two compelling candidates, both of whom could admirably serve as Houston's Fire Chief. On this summary judgment record, therefore, the Court simply cannot say that "no reasonable person, in the exercise of impartial judgment, could have chosen [Mr. Garrison] over [Mr. Julian] for the [Fire Chief position]." *See Deines*, 164 F.3d at 280-81. Accordingly, Mr. Julian has not established that the City's qualifications-related reasons for hiring Mr. Garrison over Mr. Julian were merely pretextual.

26

### c)      Procedural Irregularities

Mr. Julian also argues that irregularities in the Fire Chief selection process as it concerned Mr. Garrison support a finding of pretext. While "[a] company's failure to follow internal procedures is *generally* not enough to create a genuine issue of material fact as to discriminatory motives," *Grubb v. Southwest Airlines*, 296 F. App'x 383, 390 (5th Cir. 2008) (emphasis added) (citing *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 819 (5th Cir. 1993)), "the nature of the internal policy and the extent of the deviation in the particular case could give rise to evidence of pretext in light of all the other relevant facts," *Martinez v. Texas Workforce Comm'n-Civil Rights Div.*, No. A-11-CA-837 LY, 2014 WL 931425, at *7 (W.D. Tex. Mar. 10, 2014) (citing *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005)).

Here, Mr. Julian contends that Mr. Garrison neither timely applied for the Fire Chief position, nor underwent a telephone interview, which was a component of the selection process. In support, Mr. Julian produces an application dated August 16, 2010, and cites to Mr. Garrison's testimony about the telephone interview. (*See* Doc. Nos. 36-9; 36-17 at 12:5-14:7, 26:10-27:7, 29:3-32:23.) ESCI had established a deadline of June 24, 2010 for all applications. Mr. Julian further claims that Mr. Garrison removed himself from selection with a telephone call, and then later revived his application with another telephone call. (Doc. No. 36-6 at 92:10-15; 93:7-15.)

The summary judgment record is not quite so conclusive, however. Mr. Freshour, ESCI's witness, repeatedly stated that ESCI did indeed have a timely application from Mr. Garrison. (Doc. No. 36-6 at 91:6-17; 92:10-11, 16-17.) He was unable to explain why the application produced in discovery was dated August 16, 2010 though he clarified that "I don't know how to explain the date. I do know that if we had not had an application that was in our office by the deadline, we would not have considered him." (Doc. No. 36-6 at 92:2-5.) Mr. Garrison

acknowledged the August 16, 2010 application, but was unable to definitively state when or how he applied for the Fire Chief position. (Doc. No. 36-17 at 12:5-14:7.) Additionally, both parties have produced a submission dated May 8, 2010 whereby Mr. Garrison "respond[s] to [the City's] search for Fire Chief, City of Houston." (Doc. Nos. 34-11, 36-10.) Mr. Julian argues that this cannot be considered Mr. Garrison's application because it does not affirmatively state that he is applying for the Fire Chief position, and is unsigned.

Further, Mr. Garrison could not remember whether he had undergone a telephone interview as part of the selection process. According to Mr. Garrison, "[i]t's kind of all a blur." (Doc. No. 36-17 at 26:10-27:7; 29:3-32:23.) In addition, Mr. Freshour clearly remembers that Mr. Garrison withdrew his name from consideration in a telephone call because of a death in the Daisy Mountain Fire District department where he was Interim Fire Chief at the time. He also remembers that Mr. Garrison revived his application "within about two to three days" with another telephone call. Finally, Mr. Freshour states that the City approved the revival of Mr. Garrison's application. (Doc. No. 36-6 at 93:7-95:2.) Importantly, Mr. Julian never cites a rule or policy barring such a revival.

At summary judgment, the Court cannot weigh the evidence or make credibility determinations, and it must draw all reasonable inferences in favor of the non-moving party. Here, the evidence regarding Mr. Garrison's application is most troubling. Mr. Freshour, an individual intimately involved in the selection process, clearly and unequivocally recalls that ESCI had received a timely application from Mr. Garrison. Mr. Garrison's testimony is inconclusive. The extant documentary evidence is similarly inconclusive. While one application bears a date past the application cutoff, the May 8, 2010 document, which, when read in context, can fairly be understood as expressing a desire to seek the Fire Chief position, was submitted

before that date. Mr. Julian is correct that the May 8, 2010 document is unsigned. While this evidence may serve to raise a fact question as to whether the rules were bent regarding Mr. Garrison's application, the Court is not persuaded that it is sufficient to demonstrate pretext because it does not serve to cast any doubt on the legitimate, nondiscriminatory reason the City has proffered for its decision: that Mr. Garrison was better qualified for the Fire Chief position than Mr. Julian. Summary judgment is therefore warranted as to Mr. Julian's race and age discrimination claims regarding the denial of the Fire Chief position.

### 2.  Retaliation

Mr. Julian also argues that he was denied the Fire Chief position because he had previously successfully sued the City for employment discrimination in HFD. The parties' dispute regarding this claim largely goes to whether Mr. Julian has established a prima facie case. It is undisputed that Mr. Julian has engaged in protected activity: he successfully litigated anti-employment discrimination actions against the City from 1999-2007. It is also undisputed that the denial of the Fire Chief position is an adverse employment action. The parties disagree as to whether Mr. Julian has established a causal link between his previous protected activity and the denial of the Fire Chief position.

The City argues that the temporal proximity of Mr. Julian's protected activity and the adverse employment action is highly attenuated because of the three-year gap between the close of Mr. Julian's litigation against the City and the denial of the promotion to Fire Chief. Citing *Mato v. Baldouf*, 267 F.3d 444 (5th Cir. 2001) and *Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165 (5th Cir. 2014), the City avers that, as a matter of law, such a length of time between the protected activity and the adverse employment decision is simply insufficient to establish the causal link required in retaliation cases. Mr. Julian responds that the relevant period

for assessing temporal proximity in this case is not the time between his litigation and the denial of the promotion, but, rather, the time between when he informed the City of his past protected activity in his application for the Fire Chief position and the denial of the promotion. That time period, Mr. Julian points out, was only a matter of a few months. Mr. Julian argues that this close temporal proximity supports a conclusion that an impermissible retaliatory motive led to the denial of the promotion to Fire Chief.

While courts rightly require that employers know about the protected activity in question before they will infer causation, mere knowledge of the protected activity is insufficient to establish a causal link. *See Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003) ("Although the plaintiff's burden at the prima facie stage is not onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of [her] protected activity."); *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997) ("[T]he mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a *prima facie* case.") Evidence beyond mere knowledge is required.

One place to begin is temporal proximity; courts routinely infer retaliatory motive based on an assessment of the proximity of the adverse employment decision to the protected activity. Courts have consistently declined to set bright-line rules as to how long a span of time between protected activity and a subsequent adverse employment decision is too long to support an inference of retaliatory motive, preferring instead to evaluate the individual circumstances of each case. *See Smith v. Xerox Corp.*, 371 Fed. App'x. 514, 520 (5th Cir. 2010). Nevertheless, as a general matter, the closer the temporal proximity, the more likely that courts will infer retaliation. *See Evans*, 246 F.3d at 354 ("Close timing between an employee's protected activity

and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation.") (quoting *Swanson*, 110 F.3d at 1188). A lapse "of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Id.* (citing *Weeks v. NationsBank, N.A.*, No. 3:98-CV-1352M, 2000 WL 341257, at *3 (N.D. Tex. Mar. 30, 2000)). Without other evidence of retaliation, though, courts in the Fifth Circuit typically do not infer retaliation when there is a period greater than seven months separating the protected activity from the adverse employment decision. *Gibson v. Verizon Servs. Org., Inc.*, 498 F. App'x 391, 397 (5th Cir. 2012); *see also Harvey v. Stringer*, 113 F. App'x 629, 631 (5th Cir. 2004) ("This Court has never held that a 10-month time lapse, on its own, is sufficient to satisfy the causal connection for summary judgment purposes.").

Turning to the specific question here, that of how to calculate temporal proximity, the Fifth Circuit has looked to the date the protected activity was initiated. *See, e.g.*, *Mitchell v. Snow*, 326 Fed. App'x 852, 856 n.6 (5th Cir. 2009) ("the complaint appears to be the relevant starting point"); *Strong v. University Healthcare System, L.L.C.*, 482 F.3d 802, 807-08 (5th Cir. 2007); *see also Hanks v. Shinseki*, No. 3:08-1594-G ECF, 2010 WL 3000835, at *7 (N.D. Tex. July 28, 2010); *id.* at *7 n.42 (citing cases). Because knowledge by the employer of the protected conduct is also required, the appropriate date to begin calculating temporal proximity in this case is further complicated.

The parties do not dispute that the person ultimately in charge of hiring the new Fire Chief was Mayor Parker. But, Mayor Parker was not involved in the selection process until ESCI's work was completed and it recommended to her two final candidates. So, which is the

relevant date - when Mayor Parker learned of Mr. Julian's previous protected activity, or when ESCI learned of it, on June 18, 2010, when Mr. Julian submitted his application to ESCI?[12]

"In the employment context, the actions of ordinary, non-supervisory employees" – such as the ESCI team members – "are not typically a basis for a claim." *Land v. Dietz*, 276 F. App'x 384, 387-88 (citing *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002)). "An exception is where the decision-maker functions as the ordinary employee's 'cat's paw' such that the adverse employment decision could fairly be attributed to the employee." *Id.* (citing *Gee*, 289 F.3d at 346). "The ultimate question, therefore, is whether 'the employee can demonstrate that others had influence or leverage over the official decisionmaker.'" *Gee*, 289 F.3d at 346 (quoting *Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001)).

In this case, the evidence is undisputed that Mayor Parker had no involvement in the selection process until ESCI submitted candidates for her review and that Mr. Julian was not one of the candidates ESCI put before Mayor Parker. There is no evidence that Mayor Parker conducted any independent review. (*See* Doc. No. 36-20 at 11:18-12:2 ("I knew how many people had applied. But I did not ask to know their names, their information. I wanted to be – I didn't want to interfere with the process in any way.")). Indeed, the summary judgment record reveals that ESCI possessed a high degree of control over the selection process. Therefore, Mayor Parker's decision not to appoint Mr. Julian as Fire Chief can be fairly attributed to the

---

[12] Mr. Julian asserts that ESCI learned of his past protected activity in mid-May 2010 when the City passed along to ESCI the names of individuals who had applied to it rather than to ESCI, including Mr. Julian's. The summary judgment record, however, is not conclusive as to whether anything more than those *names* were submitted, however. Consequently, the Court will not use a mid-May date. Even if the entirety of Mr. Julian's application to the City Council (which, unlike his application directly to the Mayor, discussed his past protected activity) was submitted to ESCI at that date, however, and the Court adopted this date as the point at which the ESCI team was aware of Mr. Julian's protected activity, the time span between this date and the date Mr. Garrison was hired, August 25, 2010, is still short enough to support a causal link.

actions of the ESCI team members. In this context, then, the appropriate starting point is when ESCI learned of Mr. Julian's past protected action on June 18, 2010. Thus, very little time passed between the points when ESCI learned of Mr. Julian's past protected action, when it did not recommend that he advance to Fire Chief, and when Mayor Parker appointed Mr. Garrison Fire Chief, on August 25, 2010 – in all, only a matter of about two months. Under Fifth Circuit precedent, such a short time span is sufficient to support a causal link.

Mr. Julian also argues that one of his supervisors, Roy Hamm, gave him a series of negative performance reviews beginning in 2005 and lasting until at least 2010, and that this evidence supports his retaliation claim. The Court is not persuaded, however. Mr. Hamm was not the decisionmaker responsible for denying Mr. Julian the Fire Chief position. Nor were performance reviews included in the materials before ESCI when it conducted the initial review and ranking that denied Mr. Julian a place in the twelve-person semifinalist group. (*See* Doc. No. 34-4 at 161:7-23.) Therefore, even assuming that Mr. Hamm did give Mr. Julian negative performance reviews following Mr. Julian's protected activity, the Court will not impute any alleged retaliatory animus on his part to those decisionmakers involved in the Fire Chief selection process. Moreover, Mr. Julian has produced neither argument nor evidence claiming or supporting a "cat's paw" theory by which Mr. Hamm somehow had control over or influence on the Fire Chief selection process.[13] *See, e.g.*, *Gee*, 289 F.3d at 346 (discussing the "cat's paw" theory); *Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001) ("Typically, "statements by non decision makers, or statements by decision makers unrelated to the decisional process itself [do

---

[13] Moreover, as discussed below, the alleged negative performance reviews from Mr. Hamm cannot themselves be considered retaliatory employment decisions as a matter of law, because they are time-barred.

not] suffice to satisfy the Plaintiff's burden.") (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).

Though the Court will not consider Mr. Hamm's alleged negative performance ratings as evidence supporting retaliation, the Court nevertheless is persuaded that there is sufficient temporal proximity between the point at which the decisionmakers involved in the Fire Chief selection process learned of Mr. Julian's past protected action, and the denial of the Fire Chief position to support a causal link. Thus, while it is perhaps weak, the Court concludes that Mr. Julian has established a prima facie case of retaliation with regard to the denial of the Fire Chief position.

The City has not explicitly pointed to a legitimate, non-retaliatory reason for denying Mr. Julian the Fire Chief position; its argument begins and ends with the temporal proximity question. Such a failure could be sufficient to prevent summary judgment. The Court will excuse this failure, however, as the City has produced legitimate, nondiscriminatory reasons for its selection of Mr. Garrison with respect to Mr. Julian's discrimination claims, reasons which are equally applicable here: that Mr. Julian did not advance through ESCI's selection process, and that Mr. Garrison was better qualified for the position than Mr. Julian. Mr. Julian himself assumes these reasons in his briefing, and responds to them, explicitly incorporating his arguments that those reasons were merely pretextual. According to the above analysis of Mr. Julian's arguments, however, they fail to show pretext in the retaliation context, just as they did in the discrimination context. Consequently, the Court must grant summary judgment because Mr. Julian has failed to show pretext.

### B.  Opportunity to "Ride Up" in the Shift Commander Position

Under Texas Local Government Code § 143.111, a member of a fire department "from the next lower classification [may] temporarily fill a position in a higher classification." Such a temporary classification, known in HFD as "riding up," entitles the individual to the base salary of the higher position, as well as that individual's own longevity pay while the individual is "riding up." The statute specifically explains that, "[t]he temporary performance of the duties of a higher position by a person who has not been promoted as prescribed by this chapter may not be construed as a promotion of the person." *Id.*

It is clear that, in both his EEOC complaint and his First Amended Petition, Mr. Julian alleges that he was denied the opportunity to "ride up" as Acting Deputy Chief/Shift Commander several times between 1992 and 2011. However, apart from the December 2010 employment action discussed below, nowhere does he identify any specific applications for or denials of the opportunity to "ride up" as Acting Deputy Chief/Shift Commander. Nor, in fact, does he come forward with *any* facts regarding these allegations. The conclusory statements in Mr. Julian's First Amended Petition are insufficient. Therefore, the Court must grant summary judgment as to this claim, because Mr. Julian has failed to establish a prima facie case of employment discrimination.

From there, however, his allegations regarding "riding up" as Acting Deputy Chief/Shift Commander are exceedingly unclear. In both his EEOC complaint and First Amended Petition, Mr. Julian sometimes appears to conflate HFD's search for a new *permanent* Deputy Chief/Shift Commander in 2010 with HFD's search for an *Acting* Deputy Chief/Shift Commander to fill the new position until a permanent Deputy Chief/Shift Commander was appointed, which was also conducted in 2010. All things considered, the crux of Mr. Julian's complaint appears to be that

he was not selected by Carl Matejka in December 2010 to "ride up" as Acting Deputy Chief/Shift Commander after Mr. Garrison created a new, and permanent, eighth Deputy Chief/Shift Commander position.[14] He alleges both race and age discrimination as well as retaliation, though he nowhere discusses retaliation with respect to this claim. The Court discusses each of these claims in turn.

### 1. Eighth Deputy Chief/Shift Commander Position: Race and Age Discrimination

Mr. Julian claims to have established a prima facie case for both race and age discrimination in the failure to allow him to "ride up" in the new Deputy Chief/Shift Commander position: 1) he is and African-American, and, at the time, was 67 years old; 2) he was qualified to "ride up" in the Shift Commander position; 3) he was not selected to "ride up" in the Shift Commander position; and 4) the City continued to seek candidates with Mr. Julian's qualifications until it selected younger Caucasian and African-American men to "ride up" in the Shift Commander position.

---

[14] Any challenge Mr. Julian brings to the denial of the new, *permanent* Deputy Chief/Shift Commander position must fail as a matter of law. At the time Mr. Julian sought the eighth permanent Deputy Chief/Shift Commander position, Section 143.021 of the Texas Local Government Code stated that, with certain exceptions (one being the appointment of the Fire Chief's command staff), "an existing position or classification or a position or classification created in the future either by name or by increase in salary may be filled only from an eligibility list that results from an examination held in accordance with this chapter." Tex. Local Gov't Code § 143.021(c) (1995). Here, it is undisputed that the Deputy Chief/Shift Commander positions are filled from the ranks of the Deputy Chiefs. Further, it is also undisputed that Mr. Julian never sat for the Deputy Chief examination. Therefore, as a matter of Texas law, Mr. Julian was never qualified to fill the *permanent* position of Deputy Chief/Shift Commander. The City does not dispute that he was eligible to fill the *Acting* Deputy Chief/Shift Commander position. *See* Tex. Local Gov't Code § 143.111 (allowing individuals "from the next lower classification" temporarily to fill a higher position). Thus, with respect to the denial of the *permanent* Deputy Chief/Shift Commander position, Mr. Julian cannot establish, as a matter of law, a prima facie case under the *McDonnell Douglas* framework.

The City first responds by arguing that, in fact, "riding up" in the Shift Commander position is not an adverse employment action for *McDonnell Douglas* purposes, and, therefore, Mr. Julian has not established a prima facie case. In the Fifth Circuit, an adverse employment action for Title VII discrimination claims "include[s] only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'" *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)); *Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 532 n.2 (5th Cir. 2003) (identifying actions that do and do not qualify as "ultimate employment decisions" and collecting cases).

Here, Mr. Julian characterizes "riding up" as Shift Commander as a promotion. In its briefing, the City refers to it as something akin to being Acting Shift Commander, which does align better with the statutory authorization for and description of the practice. As discussed above, Texas law makes it clear that the employment practice known as "riding up" cannot be considered a promotion. Tex. Local Gov't Code § 143.111(b). That is not dispositive for the question of whether the denial of the opportunity to "ride up" constitutes an adverse employment decision, however.

The Fifth Circuit has recognized that, in some circumstances, certain employment actions, while they may not *actually* be promotions, may *effectively* be demotions. In *Alvarado*, for example, the Fifth Circuit discussed the differences between lateral transfers and promotions and demotions. It concluded that, although, as a general matter, purely lateral transfers do not constitute adverse employment decisions, in certain circumstances, they may constitute a demotion. *Alvarado*, 492 F.3d at 612. Likewise, the Fifth Circuit explained that, "if the [transfer] position sought was objectively better, then the failure to award the position to the plaintiff can

37

constitute an adverse employment action." *Id.* at 614. The Fifth Circuit provided several factors to consider in making this determination: whether the position "entails an increase in compensation or other tangible benefits; provides greater responsibility or better job duties; provides greater opportunities for career advancement; requires greater skill, education, or experience; is obtained through a complex competitive selection process; or is otherwise objectively more prestigious." *Id.*

While it may not be a true promotion, it cannot be disputed that "riding up" is a transfer, and though it is generally considered temporary, it is not time-limited by statute, nor was it time-limited in Mr. Matejka's announcement. Under the rubric developed in *Alvarado*, the Court is persuaded that Mr. Julian suffered an adverse employment decision for the purposes of the *McDonnell Douglas* analysis when the City denied him the opportunity to "ride up" in the Shift Commander position. First, by statute, an individual who "rides up" in a higher position is entitled to the additional pay accompanying that position. Second, the Deputy Chief/Shift Commander provides "greater responsibility or better job duties" than the District Chief position, which Mr. Julian occupied at the time. For example, at the time, on each shift, there was one Deputy Chief/Shift Commander to supervising the twenty-one district chiefs, who themselves supervised HFD's ninety-two fire stations. Mr. Garrison sought to add another Deputy Chief/Shift Commander for each shift, so that each Deputy Chief/Shift Commander would supervise eleven district chiefs. (Doc. No. 36-17 at 57:23-58:8.) Third, the summary judgment record provides reason to believe that experience as an Acting Deputy Chief/Shift Commander would provide greater opportunities for advancement. The applications for the Fire Chief position, for example, list each position held – including "Acting" positions. Additionally, the opportunity to "ride up" was obtained through a competitive internal selection process which

involved the submission of applications and evaluation by a high-ranking HFD executive. (Doc. Nos. 36-18; 36-23 at 16:2-15.) The Court is persuaded that, under controlling Fifth Circuit precedent, Mr. Julian experienced an adverse employment decision when the City denied him the opportunity to "ride up" as Shift Commander in December 2010. With the question of whether the denial of the opportunity to "ride up" as Shift Commander resolved, the Court is persuaded that Mr. Julian has established a prima facie case under *McDonnell Douglas*.

Arguing that Mr. Julian has produced no evidence of any discriminatory intent in selection process conducted by Mr. Matejka, the City claims that its selection process was nondiscriminatory. *See Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 347 (5th Cir. 2013). In support of this contention, the City points to the fact that Greg Lewis, an African-American man, was considered and selected for the position. It also points out that Mr. Julian was considerably older than *all* the other applicants for the position, so any other individual chosen would have necessarily been younger than him. Finally, it claims that Mr. Julian cannot show that he was clearly more qualified than the individuals chosen for the position.

Mr. Julian therefore focuses on the City's process of selecting those who would "ride up" as the eighth Acting Deputy Chief/Shift Commander. Mr. Matejka worked at HFD from 1974 to 2012. He retired that year, as Executive Assistant Fire Chief. (Doc. No. 36-23 at 4:16-24.) He was Acting Executive Assistant Fire Chief when he conducted this selection process. (Doc. No. 36-23 at 5:15-6:6.) This selection process involved assembling a folder for each of the seven applicants for the positions, which included each applicant's letter of interest and performance evaluations. (Doc. Nos. 36-18; 36-23 at 16:2-7.) The position's qualifications, which were set by Mr. Matejka, did not include prior experience as a Shift Commander. (Doc. Nos. 36-17 at 58:9-59:13; 36-18; 36-23 at 12:15-25.) Instead of interviewing the candidates, Mr. Matejka selected

those who would "ride up" as Acting Shift Commander based on the materials in the folders and his "experience with the individuals." (Doc. No. 36-23 at 16:2-15.)

Mr. Julian claims that subjective criteria such as Mr. Matejka's own "experience with the individuals" are "highly suspect." MSJ Resp. at 33-34 (citing *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 682 (5th Cir. 2001)). However, in the Fifth Circuit, it is well-settled that such subjective assessments may indeed constitute permissible bases for employment decisions. *Alvarado*, 492 F.3d at 616 (citing *Patrick*, 394 F.3d at 317). But, as was explained above, under controlling Fifth Circuit precedent, such subjective assessments are only acceptable to satisfy a defendant's burden of production in the *McDonnell Douglas* framework when they are accompanied by a "clear and reasonably specific" basis for the assessment. *Id.* at 616-17 (citing *Burdine*, 450 U.S. at 258; *Patrick*, 394 F.3d at 316-17; *Chapman*, 229 F.3d at 1034; *Target*, 460 F.3d at 957-58).

Here, the City has asserted that its process was legitimate and nondiscriminatory, but it has failed to produce sufficient reasons explaining Mr. Matejka's subjective assessment of the candidates. The City has produced no documentary evidence explaining the employment decisions. Though the City does not point to it, the summary judgment record does contain something approaching an explanation regarding one of the candidates. In his deposition, Mr. Matejka identified the traits which led to Richard Mann's selection to "ride up" as one of the eighth Acting Deputy Chiefs/Shift Commanders: "his [performance evaluation], his command of the incident management system, his attention to detail. . . . His ability to manage a large scale incident. . . . He was engaged in the department trying to improve it." (Doc. No. 36-23 at 24:7-24.) But, the record contains nothing of this nature regarding the other applicants, including Mr.

Julian. The Court can only conclude that the City has failed to meet its burden of production. Accordingly, summary judgment is not warranted.

### 2.  Eighth Deputy Chief/Shift Commander Position: Retaliation

Mr. Julian's retaliation claim relating to the denial of the opportunity to "ride up" in the eighth Deputy Chief/Shift Commander fails because Mr. Julian has not established a prima facie case. Mr. Julian submits no evidence supporting a causal link between his protected activity and this adverse employment decision apart from temporal proximity. Mr. Julian offers only an excerpt from Mr. Matejka's deposition in which he affirms that he knew, while he was working for HFD, that Mr. Julian had sued the City. (Doc. No. 36-23 at 33:3-24.) Mr. Matejka was not able to state from whom he learned of the lawsuits, though he was able to report that he had heard that Mr. Julian had successfully brought age discrimination claims. (*Id.*) Nowhere does he state when he learned of Mr. Matejka's lawsuits. Because the Court cannot say *when* Mr. Matejka learned of the protected activity, Mr. Julian cannot show close proximity. Particularly because the protected activity concluded about three years prior to the adverse employment decision in question, the Court must conclude that this evidence is insufficient to establish any close proximity between Mr. Julian's protected action and the adverse employment decision at issue. Without causal link evidence, Mr. Julian has failed to establish a prima facie case of retaliation. Accordingly, summary judgment is warranted.

### C.  Unfavorable Performance Ratings

Finally, in addition to the above claims, Mr. Julian also alleges that he received unfavorable performance ratings because of race and age discrimination and retaliation. These allegations must fail, however, because the Fifth Circuit has determined that negative

41

performance ratings are not adverse employment decisions. *See Clayton v. Rumsfeld*, 106 F. App'x 268, 270 (5th Cir. 2004).

A successful employment discrimination claim must involve such an adverse employment decision, whether that claim concerns discrimination or retaliation. *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 298 (5th Cir. 1994). Under Fifth Circuit precedent, "[a]n adverse employment action could include a discharge, demotion, refusal to hire, refusal to promote, reprimand, or acts of sabotage by employees against other employees, either condoned or directed by an employer for the purpose of establishing cause for discharge." *Clayton*, 106 F. App'x at 270. Courts within the Fifth Circuit have determined that lowered performance ratings are not adverse employment decisions. *See, e.g.*, *Robinson v. Rubin*, 77 F. Supp. 2d 784, 790-91 (S.D. Tex. 1999) (collecting cases). Thus, Mr. Julian cannot establish a prima facie case of discrimination or retaliation with regard to the unfavorable performance ratings. Summary judgment is appropriate.

## V. CONCLUSION

For the above reasons, the Court **DENIES** summary judgment with respect to Mr. Julian's race and age discrimination claims relating to the denial in December 2010 of the opportunity to "ride up" as Acting Deputy Chief/Shift Commander in the newly created eighth Deputy Chief/Shift Commander position. The Court **GRANTS** summary judgment as to the remainder of Mr. Julian's claims.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the thirty-first day of July, 2014.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE